We'll hear argument now in the case of Sidney Hillman's Center of Rochester against Abbott Laboratories. Mr. Sabella, I am delighted that all the parties in this case have pronounceable names. Thank you, Your Honor. In holding that the RICO proximate cause requirement was not met because the misrepresentations here were not made directly to or relied on by plaintiffs, the decision below is in conflict with the Supreme Court's decision in Bridge. We recognize that proximate cause requires a direct relationship between the fraud and the injury, but as Your Honor said in Phoenix Bond, direct victim is different from direct recipient of the misrepresentations. Whereas here a drug company makes misrepresentations to induce doctors to prescribe an ineffective drug, the people who pay for those prescriptions, which are the plaintiffs in this case, are direct victims. Both the First Circuit and the Third Circuit have so held, and we think this Court should join them. Do you have a complete rundown of where the circuits stand on this question? There's something of a rundown at page two of Abbott's brief. Do you agree with that or are they missing things? No, I don't agree with it in the following sentence. We know the First and Third Circuit really on the same facts have held this Court. Well, there's a dispute about whether it's the same facts, but we can read what their rationale is. In the other circuits, in the Second Circuit, there's the Eli Lilly case. But first of all, that case was up on summary judgment and class certification, not on a motion to dismiss. And secondly, the issue in that case, there were two types of claims. One had to do with the price being paid, and that's the one where the Second Circuit said no, no, no, the plaintiffs are wrong. There's too many steps in determining whether you would have paid a different price or not. But on the quantity claim, too many prescriptions being written based on the misrepresentations, that claim was remanded. So the Second Circuit has really not decided this issue. The Ninth Circuit case is a non-presidential opinion. So it seems to me that kind of doesn't count. We go by the usual rule here that Ninth Circuit cases are not presidential. Any of them. Any of them. Okay. And then there's the Eleventh Circuit case. In the Eleventh Circuit, the District Court went with the arguments that Abbott is making. But when it went up to the Eleventh Circuit, they didn't decide it on that basis. They decided on the basis that there wasn't an injury. So I don't really think there's any circuit that has squarely held on the other side of where we are in this case. Now, in Bridge. Of course, you'll also want to discuss the Teamsters case from this circuit. Yes. Yes. Let me do that right now. That's where I was headed. Teamsters and the other tobacco cases, there's a tobacco case in the Second Circuit as well, are very different cases. Because those are cases where the insurer is not suing for paying for the cigarettes that were bought. They're saying, well, the people who smoked got sick from them, and they had more medical bills, and the injury to the insurers was essentially derivative of the injury to the plaintiffs, to the smokers. Now, that's a very different case. And we recognize that if the injury is derivative of somebody else's injury, then you're pretty much out of court. That's not the case here. How about to phrase Abbott's argument, as I understand it, it is that the injury here is derivative of someone else's decisions. And the decisions, the active decisions being made, are those of the physicians who prescribe Depakote off-label or who don't. And one might think some physicians listen to blandishments of Abbott's representatives and do absolutely nothing in response. Some physicians are going to prescribe Depakote off-label whether they ever hear anything from Abbott or not. And just take those two. If you take those two possibilities, how can one decide what effect the representations of Abbott's representatives actually had on what the physicians did? Yeah, well, the way it gets done in the case is through statistical analysis. You say in Area A, they spent $10 million on off-label promotions over this period, and prescriptions went up 500%. In Area B, they didn't spend any money, and prescriptions went up 2%. And they do a regression analysis. I mean, that's the way it was done in Neuront. That sounds like the kind of analysis the plaintiffs wanted to do in Illinois Brick. And, of course, I raise Illinois Brick because it, too, is an antitrust case requiring tracing through multiple steps. I think Illinois Brick favors us. Because what Illinois Brick says is that the person who is directly injured has the claim. And you don't want to look at how somebody else downed the road. We're the direct victim. I mean, the doctors may have been influenced in terms of prescribing or not, but they're not victims. They didn't pay any money. It's actually fairly complicated to figure out who the victims are. If Depakote is the wrong drug for the conditions of people who have medical problems, then they, too, are victims. And they may have product liability claims. In Neuront, they did. But it didn't stop the First Circuit from saying the people who paid for prescriptions also have claims. I mean, there could be product liability claims out there. We're not involved in that. And if those people got sick and they had increased bills, we're not involved in that. Illinois Brick might be a problem if we tried to be involved in that. But we're not, and that would be like Teamsters. But we're not arguing that. In this case, for the money that we paid, there is no other victim standing between us and Abbott. If we're not the direct victim, there's no direct victim for the money that was paid for all these prescriptions. Let me ask you this. Were Abbott's misrepresentations the only reason doctors might prescribe Depakote for the off-label uses? Were there any studies? The studies were all negative. The studies all showed it wasn't effective for agitation in dementia patients and schizophrenia. The studies showed that it was not effective. And I would point out something when we're talking about this, Your Honor. In the settlement agreement that Abbott entered into with Medicare and Medicaid, where they paid a billion dollars, there are certain statements that they say they don't sign on to. But there are certain statements where they say we do admit these statements. And this is one. This is at ECF 104-1, pages 4 to 5. The following appears. Promotion of Depakote to health care providers for the treatment of schizophrenia caused, that's their word, caused the submission of certain claims to federal health care programs for that use. These programs paid millions of dollars for claims resulting from the use of Depakote to treat schizophrenia. And I'd suggest that exactly the same thing is true with respect to the health and welfare benefit plans and the insurers that we represent here. Proximate cause is a flexible concept, Supreme Court said in breach. You look to whether the injury is derivative. You look to whether there's a more direct victim. You look to whether it's foreseeable or not. And all of those criteria suggest that the claim here satisfies proximate cause. It would be, as one of the cases we cited said, it would be extraordinary to think that you spend a billion dollars on off-label marketing and it doesn't have a significant effect on the writing of prescriptions. If we have to sort out which prescriptions and how many, that's a data decision. You always hope that people are behaving rationally. So that argument relies on the fact that Abbott is making rational investments. Is a statistical analysis of the sort you mentioned in the record? No, it's a motion to dismiss. That doesn't prevent the introduction of such an analysis. Well, it isn't, no. So the answer is no. No, the answer is no. No, that hasn't been done when we get to the damages. Is such an analysis published anywhere so that we could go look at it? Relating to Depakote? No, not that I'm aware of, Your Honor. Okay, thank you. One more point I'd like to make. Abbott talks frequently about the language in the Holmes case in the Supreme Court that proximate cause requires one step or just one step or something like that. But what Holmes was talking about, again, was how many victims were in between the defendant and the claimant. In Holmes, you had a fraud. It caused broker-dealers to go insolvent, and that in turn injured their customers and investors and creditors and all those folks. And Holmes said, no, you can't do that. It's one step. The broker-dealers are the direct victims here. Well, here, there's no other direct victim between us and Abbott. And many of the steps, actually, I would point out, many of the steps that Abbott talks about, like whether or not the patient brings the prescription to a drugstore, whether or not it gets filled with Depakote, whether or not they come back to pick it up, I don't know whether they put a stamp on the envelope. Those are steps that are going to apply whether the claimant is a patient or a TPF or anyone. Abbott is arguing there is no direct victim here, and there is no one here who can recover the millions, probably billions of dollars that were spent on Depakote for off-label uses. And I suggest to you that just simply cannot be the law. If this Court has no other questions, I would sit down and reserve my time for rebuttal. Thank you. Okay, thank you very much. Mr. Cavanaugh. May it please the Court, Bill Cavanaugh on behalf of Abbott. Following Supreme Court and Seventh Circuit precedent, the district court correctly found that plaintiffs had inadequately pled that there was any proximate cause between defendants' conduct and their alleged harm. This case is, we submit, no different than Teamster's. If anything, the causal chain here is more remote. The intermediary decisions are more complex, and the damage analysis more speculative. Plaintiffs rely heavily on bridge. Bridge did not change the fundamental principle announced in Holmes that focuses on is there a direct relationship here. And as Your Honor pointed out, there are both intermediary decision-makers here, the physicians who, as the district court and other district courts and circuit courts have held, exercised independent judgment as to whether to utilize DEPA code for certain patients. Okay. So they exercise independent judgment. Why can't the effects of that judgment be determined statistically? Your Honor, if that were true, then in Holmes they could. I'm not asking about Holmes. I'm asking why can't the effects of that judgment be determined statistically. They may well be able to be determined statistically. They certainly have not been, to Your Honor's point. Well, I don't know whether they have been. I do know from Mr. Sabella's answer that there's no such study in the record, and perhaps there's no such study published. I'm just asking why in principle that isn't a good way to determine the effects of the physicians' independent judgment. I think because it would run contrary to the Supreme Court saying that you should not go beyond that one step except in those limited instances in which, for example, in Bridge and in BCS when it's automatic. Look, the Supreme Court said we don't go beyond the first level of injury. And if I understand Mr. Sabella's argument, the first level of injury is either the person who pays for the drug or the patient if the patient isn't getting optimal treatment, but is not the physician. The problem is that determining how much that injury is depends on what the physician is doing. That's why I'm asking about can a statistical study pin that down reliably. Your Honor. And if you'd address that, this is my third attempt. In the First Circuit, the... I'm not asking about the First Circuit. Please address my question. I don't know the answer to that, Your Honor. Okay. That's a fine answer, but you don't get the answer out of the First Circuit. I don't know whether that can be done. I would submit that doing that would run contrary to the teachings of Holmes, Anza, and Heming, because in each of those instances, the indirect victim could easily have gotten an economist to say that the losses were attributable to the conduct and teased out other potential causes. Or, for example, in James Cape, when the plaintiff in that case alleged that it was the victim of the bid rigging because it would have won those bids, that plaintiff, in theory, could have hired an economist to do an analysis to show some causal relationship here. But the courts have uniformly, the Supreme Court has been saying, as this Court has said, that it will not engage in that exercise. In Hemat Group, if I recall correctly, there was an economic study in the record. In which record, Your Honor? In the record of the case in Hemat Group. At least that's my recollection. I'll go back and look. So let me ask you, is it your position that no private party should be able to recover when companies like Abbott misrepresent their drug's effectiveness? The plaintiffs may well have common law remedies, but proximate cause under RICO has been a limiting principle. As we've seen, False Claims Act cases have been brought. State Attorney General's brought cases. There have been key TAM cases. And I would note, this is not simply a case where there is an intervening decision maker. There is also the patient. And the patient in these cases, as Judge Easterbrook noted, if Depakote was effective for that patient, they don't have a claim. If it was ineffective for that patient, and that patient had a copay or coinsurance, it had, in addition to potentially a product liability claim, it would also have a claim for some sort of economic injury. Effective or ineffective compared to what? I think this is a problem with Mr. Sabella, but if you're trying to determine whether a drug is effective or not, it's not an absolute question. It's compared to the next best alternative. If there was an alternative, that's true, Your Honor. And the alternative may have been no attempted treatment at all. The plaintiff's theory in this case is that for 14 years, there was off-label utilization of Depakote. That simply by its very nature involved physicians making independent decisions. So you have both, I would submit, intervening acts by physicians as well as independent acts of physicians. How do we know how many of the prescriptions were off-label rather than for the direct treatment of, say, epileptic seizure or manic bipolar episodes? How do we know how many? I would submit, Your Honor, there is no way of knowing that because in many indications, in many instances, there are no indications. That's my point. We would submit it is a burden that the plaintiff will not be able to meet, but certainly in this Court functioning in its gatekeeping function on the issue of proximate cause, that demonstrates the complexity of the issue because you don't simply look at was it off-label. It may have been off-label. Physicians are allowed to prescribe off-label. They have to go to the next step and say, okay, it's off-label. Was it attributable to anything Abbott did? And the next step, was it effective or ineffective for that patient? Did it work? Did it work? As Judge Eastbrook noted, it's one, a relative term in terms of whether alternatives, but it's also a qualitative issue. How effective was it? Was the schizophrenia better or the mania associated with it somewhat better? Relative to what? For the treatment of dementia. There are not particularly good treatments for dementia. Each of these involve decision-making by physicians that we would submit, as this Court noted in Empress Casino, when the plaintiffs argued that there was no credible explanation for why legislators changed their vote after 2006, and hence it must have been attributable to efforts by the then governor, who allegedly had been bribed. This Court noted there are many potential intervening acts here. And here we're talking about a 14-year period in which, as they allege, there was off-label prescriptions being issued by physicians for whatever reason. And in this case, unlike in Narottan and Avandia, there are no allegations of direct misrepresentation to third-party plaintiffs. What that means is that, as Judge Eastbrook had noted in Synthroid, these very sophisticated plaintiffs were making decisions as to what to put on their for these drugs, doing it wholly apart, according to their complaint, wholly apart from any representations made by Abbott. That is why, I submit, the causal chain here is far more complex than in Teamsters. Your Honor asked about, Judge Eastbrook, you asked about the current state of the law. You have the First and the Third Circuits, we would submit, not following the teachings of the Supreme Court in its trilogy of cases. Because after Bridge, Hemi expressly said foreseeability is not the test. In Anza, they said the intended victim is not the test. And subsequent in City of Miami and Lexmark, admittedly not RICO cases, both courts, in those instances, the Supreme Court, again, went back to the direct relationship required in Holmes and did not embrace, as plaintiffs would argue, some new standard articulated in Bridge. And again, in Bridge, there was no intervening intermediary making independent decisions. As the Supreme Court said in Bridge, it was, the selection of the bid was purely rotational, a matter of math. And then this court in BCS said, it turned out it wasn't quite rotational, but it was simply random. There was no independent decision making involved, as there is here. Finally, plaintiffs raised the issue of deterrence and multiple recoveries. As to deterrence, as this record is clear, Abbott agreed to, entered into a plea agreement with the federal government and paid $1.6 billion, has been subject to a five-year corporate integrity agreement. There certainly are deterrence steps available. And the plaintiff's remedies, as I say, there are common law remedies, there are state remedies that may be available. Unless the Court has any further questions, my time is up. Doesn't look like it. Thank you. Thank you very much. Anything further, Mr. Sabella? Yes, Your Honor. What a surprise. I'd like to observe first that I think a lot of what we've been discussing today are damages issues. And we're not kidding ourselves. We know when we get to summary judgment, there's a lot of damages issues here. But in BCS, this court said, and there's other courts that have said, that damages and proximate cause are two different things. If we have to construct a statistical model, and it's interesting, in Abbott's brief in this case, they sort of admitted that a statistician, this is on page 33, I guess, an expert could concoct a statistical model of these phenomena. It was done in Nuronten. It satisfied a district judge, a jury, and a court of appeals. So when we get there, I think we're going to be able to do it and satisfy these damages issues. Nuronten said something interesting about the decision-making process of the physicians, and I'd like to just point it out again. We quote it on page 13 of our opening brief. The fact that some physicians may have considered factors other than Pfizer's detailing materials in making their prescription decisions does not add such attenuation to the causal chain as to eliminate proximate cause. Rather than showing a lack of proximate causation, this argument presents a question of proof regarding the total number of prescriptions that were attributable to Pfizer's actions. This is a damages question. I would also address a little bit the couple of cases that counsel talked about. They mentioned in Hemi that the court, the plurality decision, said that foreseeability is not the same as proximate cause, and we're not saying that it's a pure foreseeability decision. It's just one of the factors, and that factor here obviously tends in the plaintiff's favor. In Bridge itself, it talked about predictability, but let's remember in Bridge it wasn't automatic that just because if the bad guys hadn't submitted their illegal bids that the plaintiffs in that case would have gotten the bids. There were two plaintiffs in that case, but there were a lot of other bidders. So if the wrongdoers there hadn't made their improper bids, somebody else would have gotten those bids, but not necessarily these plaintiffs, and these plaintiffs would have only gotten it if their bid was equal to or better than the bid that the bad guys had put in. So that was a case where it was predictable they were going to get some, but it certainly wasn't automatic that they were going to get all. Lastly, Your Honor, I would just point out that in the Anza case that counsel talked about, that's a very strange case. That's a case where the defendants weren't paying their taxes, and the plaintiffs were competitors, and they said, well, since they didn't pay their taxes, they were able to charge lower prices and take business away from us. That's a case where there was clearly a direct victim. That was the state that they weren't paying the taxes to. And the problems of proof that come up there with a competitor showing why he didn't get business or not, it seems to me that's just different from what we're presented to in this case. The cases here consistently say that when you make false representations to induce doctors and you induce doctors to write more prescriptions, the third party payors, the health and benefit plans, are going to pay for a lot of them. Not every one of them, probably, and they're going to probably pay for some prescriptions regardless, but they're going to pay for a heck of a lot. And proximate cause doesn't require anything more. At the damages phase, at summary judgment, at trial, we're going to have to do a lot more, but not at this stage. Thank you, Your Honor. Thank you very much. The case was taken under advisement.